602 A.2d 1277

**MARITRANS GP INC., Maritrans Partners L.P. and Maritrans Operating Partners L.P., Appellants,**

v.

**PEPPER, HAMILTON & SCHEETZ and J. Anthony Messina, Jr., Esquire, Appellees.**

Supreme Court of Pennsylvania.

Argued Jan. 17, 1991.

Decided Jan. 29, 1992.

242

244

Richard A. Sprague, Denise Pallante, William P. Murphy, Howard K. Goldstein, Gerald E. Arth, Joseph T. Pallante, Philadelphia, for appellants.

Geoffrey C. Hazard, Jr., Sterling Professor of Law, New Haven, Conn., for amicus in support of appellants.

Francis P. Newell, Arthur G. Raynes, Philadelphia, Stephen Gillers, New York City, pro hac vice, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

This case involves the question of whether the conduct of Appellee-attorneys is actionable independent of any violation of the Code of Professional Responsibility. While we agree that violations of the Code do not *per se* give rise to legal actions that may be brought by clients or other private parties, we, nevertheless, conclude that the record supports a finding that Appellees' conduct here constituted a breach of common law fiduciary duty owed to Appellant-clients and that, contrary to Appellees' argument that they cannot be prevented from representing a former client's competitors, the injunction issued by the trial court against Appellees should have been sustained by the Superior Court. As a result, we reverse the decision of the Superior Court, as more fully explained below.

Appellants, plaintiffs in the trial court and appellees in the Superior Court, are Maritrans GP Inc., Maritrans Partners L.P. and Maritrans Operating Partners L.P. (hereinafter, collectively, "Maritrans"). Appellees, defendants in the trial court and appellants in the Superior Court, are the Philadelphia law firm of Pepper, Hamilton & Scheetz (hereinafter "Pepper"), and one of Pepper's partners, J. Anthony Messina, Jr. (hereinafter "Messina"). In February, 1988, Maritrans brought an action for preliminary and permanent injunctive relief, as well as for compensatory and punitive damages, against Pepper and Messina, its former attorneys of more than ten years. Maritrans' action arises out of Pepper and Messina's representation of Maritrans' competitors, entities whose interests were found to be adverse to the interests of Maritrans, in matters substantially related to matters in which they had represented Maritrans.

On May 1, 1989, the Court of Common Pleas of Philadelphia County entered an order preliminarily enjoining Pepper and Messina from continuing to act as labor counsel for seven of Maritrans' New York-based competitors, with the exception of one discrete piece of litigation then scheduled to commence on May 8, 1989. The trial court ruled that preliminary injunctive relief was necessary given the existence of a substantial relationship (*i.e.*, a conflict of interest in derogation of Pepper and Messina's fiduciary duties to Maritrans) between Pepper and Messina's current representation of the New York companies, whose interests were adverse to the interests of Maritrans, and their former longstanding representation of Maritrans. Pepper and Messina then moved in the trial court for a stay pending appeal, and certain of the New York competitors moved for leave to intervene in the action. Both motions were denied.

Pepper and Messina then appealed the trial court's preliminary injunction order to the Superior Court which issued a judgment and opinion (Wieand, J. concurring in the result) reversing the preliminary injunction order. Maritrans' subsequent applications for a stay or an order restoring the preliminary injunction pending appeal were denied first by

two of the members of the Superior Court panel which decided the case (Wieand, J. not participating in the decision), and then by Chief Justice Nix, Jr., acting as a single justice, and not on behalf of the Court, pursuant to Rule 123 of the Pennsylvania Rules of Appellate Procedure, Pa. R.A.P. 123(e).[1] The matter is now on full appeal to this Court. For the reasons explained below, we reverse.

The facts taken in a light most favorable to Maritrans, the winner at the trial court level, are as follows:

Maritrans is a Philadelphia-based public company in the business of transporting petroleum products along the East and Gulf coasts of the United States by tug and barge. Maritrans competes in the marine transportation business with other tug and/or barge companies, including a number of companies based in New York. Pepper is an old and established Philadelphia law firm. Pepper and Messina represented Maritrans or its predecessor companies in the broadest range of labor relations matters for well over a decade. In addition, Pepper represented Maritrans in a complex public offering of securities, a private offering of $115 million in debt, a conveyance of all assets, and a negotiation and implementation of a working capital line of credit. Over the course of the representation, Pepper was paid approximately $1 million for its labor representation of Maritrans and, in the last year of the representation, approximately $1 million for its corporate and securities representation of Maritrans.

During the course of their labor representation of Maritrans, Pepper and Messina became "intimately familiar with Maritrans' operations" and "gained detailed financial and business information, including Maritrans' financial goals and projections, labor cost/savings, crew costs and operating costs." Trial court opinion, 4/21/89, at pp. 7–8. This

**1.** We wish to point out for the information of the bench and bar that the memorandum opinion issued by the Chief Justice, although within his authority to do so, was incorrectly reported as the decision of the Supreme Court. Rulings of a single justice pursuant to authority of Rule 123(e) have no precedential value and do not act as the opinion of the Court as incorrectly reported.

information was discussed with Pepper's labor attorneys, and particularly with Messina, for the purpose of developing Maritrans' labor goals and strategies. In addition, during the course of preparing Maritrans' public offering, Pepper was furnished with substantial confidential commercial information in Maritrans' possession—financial and otherwise—including projected labor costs, projected debt coverage and projected revenues through the year 1994, and projected rates through the year 1990. Pepper and Messina, during the course of their decade-long representation of Maritrans, came to know the complete inner-workings of the company along with Maritrans' long-term objectives, and competitive strategies in a number of areas including the area of labor costs, a particularly sensitive area in terms of effective competition. In furtherance of its ultimate goal of obtaining more business than does its competition, including the New York-based companies, Maritrans analyzed each of its competitors with Pepper and Messina. These analyses included an evaluation of each competitor's strengths and weaknesses, and of how Maritrans deals with its competitors.

Armed with this information, Pepper and Messina subsequently undertook to represent several of Maritrans' New York-based competitors. Indeed, Pepper and Messina undertook to represent the New York companies in their labor negotiations, albeit with a different union, during which the New York companies sought wage and benefit reductions in order to compete more effectively with, *i.e.*, to win business away from, Maritrans.

In September, 1987, Maritrans learned from sources outside of Pepper that Pepper and Messina were representing four of its New York-based competitors in their labor relations matters. Maritrans objected to these representations, and voiced those objections to many Pepper attorneys, including Mr. Messina. Pepper and Messina took the position that this was a "business conflict," not a "legal conflict," and that they had no fiduciary or ethical duty to Maritrans that would prohibit these representations.

To prevent Pepper and Messina from taking on the representation of any other competitors, especially its largest competitor, Bouchard Transportation Company, Maritrans agreed to an arrangement proposed by Pepper whereby Pepper would continue as Maritrans' counsel but would not represent any more than the four New York companies it was then already representing. In addition, Messina—the Pepper attorney with the most knowledge about Maritrans—was to act not as counsel for Maritrans but, rather, as counsel for the New York companies, while two other Pepper labor attorneys would act as counsel for Maritrans; the attorneys on one side of this "Chinese Wall" would not discuss their respective representations with the attorneys on the other side. Maritrans represented that it agreed to this arrangement because it believed that this was the only way to keep Pepper and Messina from representing yet more of its competitors, especially Bouchard.

Unbeknownst to Maritrans, however, Messina then "parked" Bouchard and another of the competitors, Eklof, with Mr. Vincent Pentima, a labor attorney then at another law firm, at the same time that Messina was negotiating with Pentima for Pentima's admission into the partnership at Pepper. Moreover, notwithstanding Pepper's specific agreement not to represent these other companies, Messina for all intents and purposes was representing Bouchard and Eklof, as he was conducting joint negotiating sessions for those companies and his other four New York clients. On November 5, 1987, Maritrans executives discussed with Pepper attorneys, *inter alia,* Maritrans' plans and strategies of an aggressive nature in the event of a strike against the New York companies. Less than one month later, on December 2, 1987, Pepper terminated its representation of Maritrans in all matters. Later that month, on December 23, 1987, Pepper undertook the representation of the New York companies. Then, on January 4, 1988, Mr. Pentima joined Pepper as a partner and brought with him, as clients, Bouchard and Eklof. In February, 1988, Maritrans filed a complaint in the trial court against Pepper and Messina.

Discovery procedures produced evidence as follows: (i) testimony by principals of the New York companies to the effect that the type of information that Pepper and Messina possess about Maritrans is of the type considered to be confidential commercial information in the industry and that they would not reveal that information about their companies to their competitors; (ii) testimony by principals of the New York companies that they were desirous of obtaining Maritrans' confidential commercial information; (iii) testimony by principals of the New York companies that labor costs are the one item that make or break a company's competitive posture; (iv) an affidavit from the United States Department of Labor attesting that, contrary to defendant Messina's sworn testimony at the first preliminary hearing in February, 1988, Maritrans' labor contracts are not on file with the Department of Labor and thus not available under the Freedom of Information Act; and other information as well.

After initially denying the preliminary injunction, the trial court delivered a bench opinion in which it was stated that the court had *sua sponte* reconsidered its decision not to enter injunctive relief against Pepper and Messina. The trial court specifically noted that by denying Maritrans' request for preliminary injunctive relief the week before— even in the face of various breaches of Pepper and Messina's fiduciary duties to Maritrans—it had not "fully account[ed] for the special relationship between attorney and client ..." but, rather, had inappropriately treated the case as a "commercial dispute involving ordinary business interests." Upon further reflection and after re-reviewing the voluminous record in this case, the trial court determined that preliminary injunctive relief was both justified and appropriate. See, Trial Court Opinion, 4/26/89, at pp. 5–8, 5–17.

In reconsidering *sua sponte* the initial decision not to enjoin Pepper and Messina, the trial court held that by initially focusing on only the November 5, 1987, meeting between Pepper attorneys and the Maritrans executives—

and not on Pepper and Messina's entire representation of Maritrans—the court had taken too restrictive a view of the test to determine whether attorneys have breached their fiduciary duties by engaging in former-client conflicts of interest, *i.e.*, the substantial relationship test. The trial court went on to hold that a substantial relationship exists between Pepper and Messina's former representation of Maritrans and their current representation of the competitors, entities whose interests are materially adverse to the interests of Maritrans in the current representation. The trial court also found that Pepper breached its obligation, which was fortified by a specific promise, to keep from Messina that which was learned after the erection of the "Chinese wall." Concluding that Maritrans was entitled to be able to proceed in its business with confidence that its plans and strategies would not be disclosed or used by Appellees, even inadvertently, the trial court ruled that preliminary injunctive relief was warranted given the existence of material adversity between Maritrans and the New York competitors, of a substantial relationship between the representations, and the fact that Maritrans had carried its burden in proving the necessity for a preliminary injunction.

The Superior Court reversed stating that the trial court erred by issuing a preliminary injunction based upon Pepper's alleged violation of the [Pennsylvania] Rules of Professional Conduct [2] without making any independent finding that Pepper's conduct was actionable. The Superior Court found that the trial court's use of Pennsylvania Rules of Professional Conduct 1.7 and 1.9 as points of reference for its breach of fiduciary duty analysis improperly augmented the substantive law of our Commonwealth. The Superior

**2.** The Superior court noted that the Pennsylvania Code of Professional Responsibility, and not the Pennsylvania Rules of Professional Conduct, were in effect at the time Pepper began representing the New York Companies. 392 Pa.Superior Ct. 153, 572 A.2d 737, 741. However, the analysis of Pepper's conduct is the same under both Code and Rules. In any event, the disciplinary rules prohibiting attorneys from engaging in former-client conflicts of interest do nothing but reaffirm pre-existing substantive law, therefore, making it irrelevant whether the trial court was guided by the Rules rather than the Code.

Court did not analyze whether the common law principles of fiduciary duty, embodied in those rules, nonetheless apply to this case. The Superior Court then held that an attorney's conflict of interest in representing a subsequent client whose interests are materially adverse to a prior client in a substantially related matter is not "actionable" in Pennsylvania. As already noted, we reverse.

■ The public's trust in the legal profession undoubtedly would be undermined if this Court does not correct the Superior Court's failure to recognize the common law foundation for the principle that an attorney's representation of a subsequent client whose interests are materially adverse to a former client in a matter substantially related to matters in which he represented the former client constitutes an impermissible conflict of interest actionable at law. The Superior Court's decision is diametrically opposed to law established by the courts of this Commonwealth and throughout the United States which have imposed civil liability on attorneys for breaches of their fiduciary duties by engaging in conflicts of interest, notwithstanding the existence of professional rules under which the attorneys also could be disciplined.

I.

*Actionability and Independent Fiduciary Duty
at Common Law of Avoiding Conflicts of
Interest—Injunctive Relief*

A preliminary injunction is a harsh remedy for which "essential prerequisites" must be proven. *See, e.g., Public Utility Commission v. Process Gas Consumers Group,* 502 Pa. 545, 467 A.2d 805 (1983). These are:

1) The Petitioner makes a strong showing that he is likely to prevail on the merits.

2) The Petitioner has shown that without the requested relief, he will suffer irreparable injury.

3) The issuance of a stay will not substantially harm other interested parties in the proceedings.

4) The issuance of a stay will not adversely affect the public interest.

502 Pa. at 552–553, 467 A.2d 805.

In *John G. Bryant, Inc. v. Sling Testing & Repair, Inc.,* 471 Pa. 1, 6–7, 369 A.2d 1164, 1166–67 (1977), we declared it "essential" that the "activity sought to be restrained is actionable." *See also, Singzon v. Commonwealth, Dept. of Public Welfare,* 496 Pa. 8, 11, 436 A.2d 125, 127 (1981); *Albee Homes, Inc. v. Caddie Homes, Inc.,* 417 Pa. 177, 181, 207 A.2d 768, 770 (1965).

 Activity is actionable if it constitutes breach of a duty imposed by statute or by common law. Our common law imposes on attorneys the status of fiduciaries *vis a vis* their clients; that is, attorneys are bound, at law, to perform their fiduciary duties properly. Failure to so perform gives rise to a cause of action. It is "actionable." Threatened failure to so perform gives rise to a request for injunctive relief to prevent the breach of duty.

 At common law, an attorney owes a fiduciary duty to his client; such duty demands undivided loyalty and prohibits the attorney from engaging in conflicts of interest, and breach of such duty is actionable. *See, e.g., Stockton v. Ford,* 52 U.S. (11 How.) 232, 13 L.Ed. 676 (1850); *Woods v. City Nat'l. Bank & Trust Co.,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941); *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265 (S.D.N.Y.1953). The Superior Court here emasculated these common law principles, in effect turning the ethical or disciplinary rules governing lawyers into a grant of civil immunity for conduct which has been condemned from time immemorial. As stated by the United States Supreme Court in 1850:

There are few of the business relations of life involving a higher trust and confidence than those of attorney and client or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them

in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it.

*Stockton v. Ford,* 52 U.S. (11 How.) at 247. By ignoring the common law principles of fiduciary duty, the Superior Court elevated attorneys above the law and granted to them greater rights and protection than are enjoyed by any other fiduciaries in this Commonwealth. No rule so preferring attorneys can be permitted to stand. See also, *American Dredging Co. v. City of Philadelphia,* 480 Pa. 177 at 185, 389 A.2d 568 at 572 (1978); *Tri–Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg,* 216 Cal. App.3d 1139 at 1150, 265 Cal.Rptr. 330 at 335 (1989).[3] Adherence to those fiduciary duties ensures that clients will feel secure that everything they discuss with counsel will be kept in confidence. *Reardon v. Marlayne, Inc.,* 83 N.J. 460, 416 A.2d 852 (1980). Pepper and Messina, as attorneys, had a duty to administer properly their responsibilities to respect the confidences of Maritrans. *See, e.g., American Dredging, supra,* 480 Pa. at 185, 389 A.2d at 572; *Slater v. Rimar, Inc.,* 462 Pa. 138 at 145, 338 A.2d 584 at 587 (1975); *Realco Servs., Inc. v. Holt,* 479 F.Supp. 867, 875 (E.D.Pa.1979); *David Welch Co. v. Erskine & Tulley,* 203 Cal.App.3d 884, 890, 250 Cal.Rptr. 339, 342 (1988).

■ Our courts clearly have the power to enjoin an attorney from breaching his duty to a client:

While the breach by a lawyer of his duty to keep the confidences of his client and to avoid representing conflicting interests may be the subject of appropriate disciplinary action, a court is not bound to await such develop-

---

**3.** The *Tri–Growth* court explained the concept of a fiduciary relationship as follows: "A fiduciary or confidential relationship can arise when confidence is reposed by persons in the integrity of others, and if the latter voluntarily accept or assume to accept the confidence, they cannot act so as to take advantage of the others' interests without their knowledge or consent. The attorney/client relationship is a fiduciary one, binding the attorney to the most conscientious fidelity." 216 Cal.App.3d at 1150, 265 Cal.Rptr. at 334–35 (citations omitted).

ment before acting to restrain improper conduct where it is disclosed in a case pending in that court.

*Slater v. Rimar, Inc., supra,* 462 Pa. at 148–49, 338 A.2d at 589 (footnote omitted). The power to enjoin the threatened violation of an attorney's fiduciary duty not to engage in conflicting representations dates at least to the early 1900's:

> **180. *Restraining Attorney from Acting Adversely to Client***
>
> Where an attorney so far forgets, or ignores, his professional duty as to engage his service to one whose interests are necessarily in conflict with those of his client, or in whose employment he will be in a position to take undue advantage of the confidential communications of such client, there is no doubt of the power of the court to enter and enforce an order restraining the attorney from so acting....

1 Thornton on Attorneys at Law (1914). Moreover, "[a] court may restrain conduct which it feels may develop into a breach of ethics; it 'is not bound to sit back and wait for a probability to ripen into a certainty.' " *United States v. RMI Co.,* 467 F.Supp. 915, 923 (W.D.Pa.1979) (citation omitted). The courts do not have to wait until the derelict attorney appears before it.

Accordingly, the trial court's preliminary injunction was a proper mechanism to abate an unlawful and actionable breach of fiduciary duties to Maritrans where the facts support such a conclusion.

## II.

### *An Attorney's Common Law Duty is Independent of the Ethics Rules*

Contrary to the arguments raised by Pepper and Messina, we conclude that the Superior Court badly confused the relationship between duties under the rules of ethics and legal rules that create actionable liability apart from the rules of ethics. The Superior Court correctly recognized that simply because a lawyer's conduct may

violate the rules of ethics does not mean that the conduct is actionable, in damages or for injunctive relief. The court was also correct in saying that the trial court's finding of violation of the ethical rules concerning misuse of a client's confidences is not as such a basis for issuing an injunction. These propositions are correct under either the Code of Professional Responsibility or the Rules of Professional Conduct.

However, the Superior Court then stood this correct analysis on its head. That court held that the trial judge's reference to violations of the rules of ethics somehow negated or precluded the existence of a breach of legal duty by the Pepper firm to its former client. The court also held that the presumption of misuse of a former client's confidences, developed in the law of disqualification, is inapplicable because the present case involves an injunction. Both of these propositions involve serious confusion in the law governing lawyers.

Long before the Code of Professional Responsibility was adopted, and before the Rules of Professional Conduct were adopted, the common law recognized that a lawyer could not undertake a representation adverse to a former client in a matter "substantially related" to that in which the lawyer previously had served the client. The universally recognized statement of this rule of law is *Consolidated Theatres, Inc. v. Warner Bros. Circuit Management Corp.*, 216 F.2d 920 (2d Cir.1954). The *Consolidated Theatres* decision relied importantly on *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc., supra.* Both of these cases relied on decisions of now more than 50 years standing such as *United States v. Bishop*, 90 F.2d 65 (6th Cir.1937); and *Gesellschaft Fur Drahtlose Telegraphie v. Brown*, 78 F.2d 410 (D.C.App.1935).

█ All of these decisions were rendered before there was a Code of Professional Responsibility. None was a disciplinary case. *Consolidated Theatres* and *United States v. Bishop* involved disqualification, which is a civil proceeding involving legal responsibilities and legal and equitable remedies. A motion for disqualification is simply

an injunctive order issued in a case already pending. The *Gesellschaft Telegraphie* case involved misuse of confidences as an equitable defense to an action by an attorney to collect a fee.

The legal obligation of a lawyer to refrain from misuse of a client's confidences goes even further back, predating the ABA Canons of Professional Ethics promulgated in 1908. *See, e.g., Bowman v. Bowman,* 153 Ind. 498, 55 N.E. 422 (1899), which was also a disqualification case. The threatened violation of this duty thus has been recognized as the basis for an injunction for at least virtually a century, as stated in the leading treatise on attorneys of about the same vintage. See, 1 Thornton on Attorneys at Law, § 180 (1914), quoted above.

■■■ The Superior Court seems to have the idea that because conduct is not a tort simply because it is a disciplinary violation, then conduct ceases to be a tort when it is at the same time a disciplinary violation. This is an inversion of logic and legal policy and misunderstands the history of the disciplinary rules. The Superior Court's decision contradicts the logic of this Court's decision in *Adler, Barish, Daniels, Levin and Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175 (1978), and in *Rizzo v. Haines,* 520 Pa. 484, 555 A.2d 58 (1989). *Adler* in particular has direct application here. That case involved lawyer misconduct that violated the ethical rule against solicitation and the legal rule against misuse of confidential employer information. Since misuse of a *law firm's* confidences is actionable while also being an ethical violation, surely misuse of a *client's* confidences can be actionable while also being an ethical violation. As regards misuse of a former client's confidences, the disciplinary rules derive from the lawyer's common law duties, not the other way around.

## III.

### Scope of Duties at Common Law

We next must discuss the scope or the contours of remedy for an attorney's breach of duty to his or her client

at common law. Attorneys have always been held civilly liable for engaging in conduct violative of their fiduciary duties to clients, despite the existence of professional rules under which the attorneys could also have been disciplined.

Courts throughout the country have ordered the disgorgement of fees paid or the forfeiture of fees owed to attorneys who have breached their fiduciary duties to their clients by engaging in impermissible conflicts of interests. *See, e.g., White v. Roundtree Trans., Inc.,* 386 So.2d 1287 (Fla.App.1980); *Perl v. St. Paul Fire & Marine Ins. Co.,* 345 N.W.2d 209 (Minn.1984); *Rice v. Perl,* 320 N.W.2d 407 (Minn.1982); *Financial Gen. Bankshares, Inc. v. Metzger,* 523 F.Supp. 744 (D.D.C.1981), *vacated on jurisdictional grounds,* 680 F.2d 768 (D.C.Cir.1982); *Goldstein v. Lees,* 46 Cal.App.3d 614, 120 Cal.Rptr. 253 (1975); *Zeiden v. Oliphant,* 54 N.Y.S.2d 27 (Sup.Ct.1945).

Notwithstanding that the attorneys in those cases could have been disciplined under applicable rules of professional conduct, disgorgement or forfeiture of fees for services rendered were ordered. Likewise, the United States Supreme Court has said:

> A fiduciary ... may not perfect his claim to compensation by insisting that although he had conflicting interests, he served his several masters equally well or that his primary loyalty was not weakened by the pull of his secondary one. Only strict adherence to these equitable principles can keep the standard of conduct for fiduciaries "at a level higher than that trodden by the crowd."

*Woods v. City Nat'l. Bank & Trust Co., supra,* at 312 U.S. at 269, 61 S.Ct. at 497 (quoting Justice Cardozo).

Courts have also allowed civil actions for damages for an attorney's breach of his fiduciary duties by engaging in conflicts of interest. *See, e.g., Tri–Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg, supra,* (permitting suit for a constructive trust and damages by a real estate partnership against a law firm that breached its fiduciary duty to the partnership by usurping a partnership opportunity); *David Welch Co. v. Erskine & Tulley, supra,*

(where the court affirmed a judgment of $350,000 against a law firm that breached its fiduciary duties toward a former client after being privy to the former client's confidential information by, *inter alia,* failing to inform the former client that the law firm prepared business proposals designed to undercut the former client's business relationships).

Courts throughout the United States have not hesitated to impose civil sanctions upon attorneys who breach their fiduciary duties to their clients, which sanctions have been imposed separately and apart from professional discipline. What must be decided in this case is whether, under the instant facts, an injunction lies to prohibit a potential conflict of interest from resulting in harm to Appellant Maritrans. Resort to simple equitable principles, as applied to the facts of this case, renders an affirmative answer to this question.

## IV.

### *Equity*

Injunctive relief will lie where there is no adequate remedy at law. *Fox–Morris Associates, Inc. v. Conroy,* 460 Pa. 290 at 294, 333 A.2d 732 at 734 (1975) (Roberts, J. concurring). The purpose of a preliminary injunction is to preserve the status quo as it exists *or previously existed before the acts complained of,* thereby preventing irreparable injury or gross injustice. *Slott v. Plastic Fabricators, Inc.,* 402 Pa. 433, 167 A.2d 306 (1961). A preliminary injunction should issue only where there is urgent necessity to avoid injury which cannot be compensated for by damages. *Independent State Store Union v. Pa. Liquor Control Bd.,* 495 Pa. 145, 432 A.2d 1375 (1981). The court which is to exercise discretion in the matter of issuance of an injunction is the trial court and not the appellate court and the action of the trial court may be reviewed on appeal only in the case of a clear abuse of discretion but not otherwise. *Rick v. Cramp,* 357 Pa. 83, 53 A.2d 84 (1947).

Pepper and Messina argue that a preliminary injunction was an abuse of discretion where it restrains them from representing a former client's competitors, in order to supply the former client with a "sense of security" that they will not reveal confidences to those competitors where there has been no revelation or threat of revelations up to that point. We disagree. Whether a fiduciary can later represent competitors or whether a law firm can later represent competitors of its former client is a matter that must be decided from case to case and depends on a number of factors. One factor is the extent to which the fiduciary was involved in its former client's affairs. The greater the involvement, the greater the danger that confidences (where such exist) will be revealed. Here, Pepper and Messina's involvement was extensive as was their knowledge of sensitive information provided to them by Maritrans. We do *not* wish to establish a blanket rule that a law firm may not later represent the economic competitor of a former client in matters in which the former client is not also a party to a law suit. But situations may well exist where the danger of revelation of the confidences of a former client is so great that injunctive relief is warranted. This is one of those situations. There is a substantial relationship here between Pepper and Messina's former representation of Maritrans and their current representation of Maritrans' competitors such that the injunctive relief granted here was justified. It might be theoretically possible to argue that Pepper and Messina should merely be enjoined from revealing the confidential material they have acquired from Maritrans but such an injunction would be difficult, if not impossible, to administer. On this point, see, *Lubin v. Lubin,* 302 P.2d 49, 144 Cal.App.2d 781 (1956). As fiduciaries, Pepper and Messina can be fully enjoined from representing Maritrans' competitors as that would create too great a danger that Maritrans' confidential relationship with Pepper and Messina would be breached.

Here, the trial court did not commit an abuse of discretion. On these facts, it was perfectly reasonable to con-

clude that Maritrans' competitive position could be irreparably injured if Pepper and Messina continued to represent their competitors and that Maritrans' remedy at law, that is their right to later seek damages, would be difficult if not impossible to sustain because of difficult problems of proof, particularly problems related to piercing what would later become a confidential relationship between their competitors and those competitors' attorneys (Pepper and Messina). The trial court already had to struggle with the problem of confidentiality in this regard. See, Trial Court opinion, 4/26/89, at pp. 9–12. In short, equitable principles establish that injunctive relief here was just and proper. Damages might later be obtained for breach of fiduciary duties and a confidential relationship, but that remedy would be inadequate to correct the harm that could be prevented by injunctive relief, at least until the court could examine the case in greater detail.

## Conclusion

In reversing the trial court's preliminary injunction, the Superior Court ignored the fact that there already exists in this Commonwealth a well-entrenched body of substantive law prohibiting fiduciaries from engaging in conflicts of interest, and that there is no law excepting attorneys from that prohibition. The Superior Court therefore erroneously concluded that the trial court had augmented the substantive law of this Commonwealth.

■■■ First, in Pennsylvania, as it is throughout the United States, the relationship between the attorney and his client is a fiduciary relationship. See, above. Second, "the concept of 'fiduciary relation' by *definition* does not permit conflicts of interest." This prohibition extends to attorneys. Restatement (Second) of Agency § 394 comment d.[4]

---

**4.** Section 394 of the Restatement (Second) of Agency states:
 Unless otherwise agreed, an agent is subject to a duty not to act or to agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which the agent is employed.
 Comment d to Section 394 provides in pertinent part:

*Accord, Slater v. Rimar, Inc., supra.* Finally, a fiduciary who breaches his duty of loyalty to his principal is liable to his principle, and an injunction is a proper remedy for the breach. See above, and see, *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy,* 415 Pa. 276 at 279, 203 A.2d 469 at 471 (1964) (where we held that even absent a restrictive covenant, a former employer can enjoin the competitive use of confidential information obtained as a result of the trust and confidence of a former employment); *Hagy v. Premier Mfg. Corp.,* 404 Pa. 330 at 337, 172 A.2d 283 at 287–88 (1961) (where we expressed the principle that a former employer is entitled to equitable protection against competitive use of information acquired by former employees in positions of trust); *Dozor Agency, Inc. v. Rosenberg,* 403 Pa. 237, 239, 169 A.2d 771, 772 (1961) (same). *See also, Boyd v. Cooper,* 269 Pa.Superior Ct. 594 at 597, 410 A.2d 860 at 861 (1979) (where the court held that a fiduciary may be enjoined from use of information acquired in a confidential relationship in addition to being liable for damages resulting from breach of fiduciary duty); Restatement (Second) of Agency §§ 394 comment e (liabilities) and 399 ("A principal whose agent has violated or threatens to violate his duties has an appropriate remedy for such violation. Such remedy may be ... (f) *an action for an injunction.*") (emphasis added).

Obviously, there are some disciplinary rules, such as Rule 3.3 of the Pennsylvania Rules of Professional Conduct (Candor Toward the Tribunal), which, if violated, may not give rise to civil liability. But could it be said that an attorney who misappropriates client funds is not civilly liable to his client, and that the client's only recourse upon discovery that his attorney has misappropriated his funds is to report the attorney to the Disciplinary Board? It is obvious that this is not and cannot be the rule. Misappro-

Unless an attorney makes full disclosure to his client, it is improper for him, in court proceedings or otherwise, to act for two clients whose interests conflict.

priating client funds is actionable, and was actionable long before the promulgation of any rule of professional conduct prohibiting such conduct. Just as there would be an independent cause of action available to a client whose attorney has misappropriated his funds, so too there is an independent cause of action available to a client whose attorney engaged in impermissible conflicts of interest *vis a vis* that client. The violator is subject to civil liability as well as injunctive relief.

After concluding that the trial court improperly relied upon the Rules of Professional Conduct without any independent finding that Pepper and Messina's conduct was "actionable," the Superior Court asserted, without any discussion or analysis of the voluminous trial court record, that its own "independent review of the record revealed no basis upon which a preliminary injunction could have been issued." 392 Pa.Superior Ct. at 164, 572 A.2d at 743. Not only did the Superior Court err in concluding that Pepper and Messina's conduct is not actionable, as set forth above, but they ignored the substantial grounds which exist to support the trial court's decision and which we have also described above. Notwithstanding the Superior Court's cursory disposal of the issue, it is clear that substantial grounds exist to support the trial court's decision that preliminary injunctive relief was necessary to abate an actionable wrong, to prevent further and continuing irreparable harm to Maritrans, and to restore the parties to the status quo as it existed prior to the wrongful conduct, and we so find. Accordingly, the Superior Court erred in reversing the trial court's grant of a preliminary injunction.

The order of the Superior Court is reversed and the order of the Court of Common Pleas granting a preliminary injunction is reinstated. The matter is remanded to the trial court for further proceedings consistent with this opinion.

NIX, C.J., and FLAHERTY, J., files dissenting opinions.

NIX, Chief Justice, dissenting.

In the instant matter the majority has concluded that appellee, Pepper, Hamilton & Scheetz ("Pepper"), was properly enjoined from representing Maritrans' competitors because of the significant risk of the disclosure of confidential information. The majority finds the creation of the relationship which harbors this risk to be a breach of Pepper's fiduciary duty to Maritrans. I believe that in reaching this result, the majority overlooks the significant body of case law that has developed in this area, as well as a key factor that renders its conclusion unreasonable.

The Chinese wall defense [1] is set forth in the Model Rules of Professional Conduct, Rule 1.11.[2] The procedure established is one whereby a single attorney or group of attorneys who has represented a particular client is isolated from another attorney or attorneys within the same firm who represent a client whose interests are substantially related but materially adverse to those of the initial client. The goal of such a procedure is to minimize the potential for the transmission of confidential information between attorneys representing clients with competing interest.

[1] The procedure set forth in Rule 1.11 ABA Model Rules of Professional Response, applies specifically to former government attorneys. *But see infra* note 3.

[2] In Pennsylvania, the same procedure is found at Rule 1.10(a) and (b) of the Rules of Professional Conduct. That Rule provides as follows:

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter unless:

(1) the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and

(2) written notice is promptly given to the appropriate client to enable it to ascertain compliance with the provisions of this rule.

The Chinese wall defense is asserted in the following manner. First, in attempting to have an attorney disqualified, the former client must show that matters embraced within a pending lawsuit, in which his former attorney appears on behalf of an adversary, are substantially related to matters wherein the attorney had previously represented the former client. Comment, *The Chinese Wall Defense to Law Firm Disqualification*, 128 U.Pa.L.Rev. 677 (1980). Once this burden, called the "substantial relationship test," is met, and the complainant has shown that the former representation exposed the attorney to confidences or secrets arguably pertinent in the present dispute, a rebuttable presumption arises that those confidences were shared. *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 723 (7th Cir.1982); *Novo Terapeutisk Laboratories v. Baxter Travenol Labs.*, 607 F.2d 186, 196 (7th Cir.1979).

To overcome this presumption, the Chinese wall defense is asserted, and the attorney and firm must demonstrate sufficient facts and circumstances of their particular case to establish the probable effectiveness of the wall. *The Chinese Wall Defense, supra,* at 704. The factors to be considered in the acceptance of the Chinese wall defense are the substantiality of the relationship between the attorney and the former client, *Silver Chrysler Plymouth v. Chrysler Motors*, 518 F.2d 751 (2d Cir.1975); the time lapse between the matters in dispute, *Westinghouse Electric Corp. v. Rio Algom Ltd.*, 448 F.Supp. 1284, 1309–10 (N.D.Ill.1978); the size of the firm and the number of disqualified attorneys, *Gas–A–Tron v. Union Oil*, 534 F.2d 1322 (9th Cir.1976); the nature of the disqualified attorney's involvement, *NCK Org. v. Bregman*, 542 F.2d 128, 133 n. 7 (2d Cir.1976); and the timing of the wall. Relevant features of the wall itself include the following:

a. the prohibition of discussion of sensitive matters

b. restricted circulation of sensitive documents

c. restricted access to files

 d. strong firm policy against breach, including sanctions, physical and/or geographical separation

ABA Opinion 342, 62 ABA J. 517, 521 (1976).[3]

Applying these factors to the instant matter, we would be inclined initially to agree with Maritrans' assertions that the wall in this case was probably defective. Despite the size of the firm and the number of attorneys involved, the timing of the wall was delayed in relation to the existence of the conflict. The relationship between Maritrans and Pepper was substantial, as was Messina's involvement with Maritrans. Of particular significance is the fact that the conflict existed not merely within the firm as a whole but within a single attorney who sought to represent competing clients.

These factors reveal serious concerns which must have been patently obvious at the time the conflict arose. Nevertheless, *Maritrans was informed of this peculiar arrangement and consented to it.* It is well-settled in the field of legal ethics *that a client's consent,* upon full disclosure of a conflict of interest, *is sufficient to permit the attorney to continue the otherwise objectionable representation. Higdon v. Superior Court,* 227 Cal.App.3d 1667, 278 Cal. Rptr. 588 (1991); *Rivera v. Chicago Pneumatic Tool Co.,* 1991 WL 151892, 1991 Conn.Lexis 1832 (Conn.Super.); *Lansing–Delaware Water District v. Oak Lane Park, Inc.,* 248 Kan. 563, 808 P.2d 1369 (Kan.1991); *McCarthy v. John T. Henderson, Inc.,* 246 N.J.Super. 225, 587 A.2d 280 (1991). *See also Parker v. Volkswagenwerk Aktiengesellschaft,* 245 Kan. 580, 781 P.2d 1099 (1989); *Superintendent of Insurance v. Attorney General,* 558 A.2d 1197 (Me.1989). Thus, while Maritrans' concerns may have been legitimate, their initial acquiescence must be construed as a forbearance of any objections based upon the *potential* for breach

**3.** Although the ABA opinion limits its application of the Chinese Wall to situations where the private-firm attorney's conflict exists because of prior government employment, case law indicates that the concept has wider applicability. *See generally,* Comment, The Chinese Wall Defense to Law Firm Disqualification, 128 U.Pa.L.Rev. 677 (1980).

of confidentiality. Having consented to the arrangement, they are now bound by their consent until such time as an actual breach of confidentiality occurs. As was previously found by this writer, *Maritrans G.P., Inc. v. Pepper, Hamilton & Scheetz*, 524 Pa. 415, 573 A.2d 1001 (1990) (Memorandum Opinion), and as Maritrans implicitly concedes, Appellant's Brief at p. 58, no actual disclosure of confidential information has occurred.[4] Maritrans' prior consent amounts to a waiver of their right to an objection based upon the fear of disclosure.

Accordingly, I dissent.

FLAHERTY, Justice, dissenting.

I join the dissenting opinion authored by Mr. Chief Justice Nix inasmuch as the record discloses consent was given by Maritrans to the arrangement and no actual breach of confidentiality is present, thus the remedy sought in this case is not warranted. The so-called "Chinese wall" defense, however, is fraught with problems, and, I strongly believe, should be scrutinized closely by the courts.

---

4. Although Maritrans repeatedly insists that it has no way of knowing whether confidences have actually been disclosed because attorney-client privilege makes that fact difficult, if not impossible, to ascertain, it does not deny conceding the absence of disclosure at the prior proceeding before this Court. Moreover, the majority in the instant appeal concedes that the concern is not that actual disclosure has occurred, but that the circumstances create significant potential for such disclosure.